UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 12-10084-PBS |
| ) | |
| BYRON JONES ) | |
| _____ ) | |

## DEFENDANT BYRON JONES' SENTENCING MEMORANDUM

Defendant Byron Jones, by and through his undersigned attorney, hereby submits the following memorandum for the Court's consideration at his sentencing in the above-captioned matter.  As explained in greater detail below, Mr. Jones respectfully submits that, after consideration of all of the factors under 18 U.S.C. § 3553(a), a sentence of 120 months—a term of ten years[1]—would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.  Mr. Jones contends that such a sentence would fall within his applicable sentencing guideline range, which he calculates to be 97 to 121 months.  Moreover, this proposed sentence would limit the scope of the unwarranted sentencing disparity that is already likely to occur in this case due to the mandatory minimum that Mr. Jones is facing here.  Indeed, a 120-month sentence would be *twice* as long as the sentence imposed upon his co-defendant, Meaghan Murphy, who engaged in and has pled guilty to charges encompassing virtually identical conduct as Mr. Jones.

---

[1] As explained in Mr. Jones' previously submitted Motion to Continue, Mr. Jones is currently constrained from asking for a sentence lower than ten years, due to the currently applicable mandatory minimum sentence.  If the Court were to continue this proceeding until after the enactment of the currently pending legislation referenced in that Motion, Mr. Jones would be free to ask for a lower sentence.

Mr. Jones further requests that this Court recommend that he be assigned to a facility where he can participate in an intensive, 500-hour, drug treatment program that offers him a full range of substance abuse and other counseling.  Admission to such a program would provide him with a greater ability to address his significant personal challenges and to return to his family with a chance to lead a productive and healthy life after his eventual release from incarceration.

## THE DEFENDANT'S PERSONAL HISTORY

Mr. Jones' personal background is summarized in the Pre-Sentence Report ("PSR").  See PSR ¶¶ 62-86.  Born in Brooklyn in 1973, Mr. Jones was raised by his mother, along with six half-siblings.  Id. ¶¶ 63-64.  Mr. Jones never knew his father.  Id.  As a child, Mr. Jones' family was economically challenged, but Mr. Jones' mother remained employed and did what she could to support the family.  Id.

During much of his childhood, Mr. Jones' mother was involved in a long-term abusive relationship, and Mr. Jones was also subjected to physical abuse.  Id.  In approximately 1987, Mr. Jones' mother finally ended that relationship, after which life improved for Mr. Jones.  Id.  Mr. Jones' mother continues to reside in Brooklyn and she remains close to and supportive of Mr. Jones.  Id. ¶¶ 66, 73.  Unfortunately, she is currently suffering from ovarian cancer.  Id. ¶ 66.  Mr. Jones also remains very close with his half-sister, Angela Jones, who resides with her husband and four children in Brooklyn, where she is employed as a loan officer for a local bank.  Id. ¶ 67.

Mr. Jones' difficult childhood was affected not only by the aforementioned domestic abuse, but also by the violent neighborhood where he lived.  Id. ¶ 68.  He dropped out of high school in the 9th grade.  At around the same time, he began a relationship with Angela McNair, with whom he later had one child, Angeliqua (now aged 22).  During this same period, Mr. Jones

2

began experimenting with using alcohol and marijuana.  Id. ¶ 78.  Mr. Jones attributes some the poor choices he has made to his substance abuse issues, explaining that it "contributed to getting him back into the criminal element."   Id. ¶ 78.

In 1992, when he was only 19 years old, Mr. Jones was arrested in North Carolina and charged with a series of federal drug-related charges.  Id. ¶ 54.  He was found guilty after a jury trial.  On March 31, 1993, despite his age and his lack of any prior criminal record, the Court in the Western District of North Carolina imposed a massive sentence upon Mr. Jones for this offense—including a period of incarceration of 420 months (35 years).  Id.  In 2006, his sentence was reduced to a term of 204 months (17 years).  Mr. Jones was released from prison in August 2007.

During his many years in prison, Mr. Jones participated in a large number of educational and enrichment programs.  Id. ¶¶ 54, 80.  He obtained his GED, and earned a number of college credits.  Id.  Indeed, Mr. Jones continues to aspire to obtain a college degree.  Id. ¶ 80.  He also regularly maintained institutional employment in food services, library services and other maintenance positions.  Id. ¶ 54.

After Mr. Jones was released in 2007, he maintained a series of positions, primarily relating to various community service organizations.  See PSR ¶¶ 82-86.  Among other things, he worked as a mental health supervisor and he held supervisory positions at several local agencies.  Id.  ¶¶ 83, 86.  He also worked at a local beverage warehouse.  Id. ¶ 82.  During this same period, Mr. Jones attempted to re-unite with Ms. McNair, although that relationship ultimately failed.  Id. ¶ 70.

In 2009, Mr. Jones met and eventually married Abby Shephard Finch, with whom the defendant had three children, twins Keon and Kyla (now aged 5) and Ava (aged 3).  The

marriage dissolved in 2010 due to personality conflicts, but Ms. Shepard Finch continues to describe Mr. Jones as a "good father who is hardworking and pretty loyal." Id. ¶ 72. While Mr. Jones' current situation has limited his contact with his children, he remains in regular contact with Ms. Shepard-Finch and the two are on good terms. Id. While Mr. Jones is well aware that his current situation will result in further separation from his family, he remains hopeful that he can eventually rejoin his family in Brooklyn and attempt to rebuild his life.

## THE OFFENSE CONDUCT

The offense conduct that is the subject of this case is described generally in paragraphs 10 through 35 of the PSR. Although Mr. Jones disputes certain additional facts that are based on statements made by a cooperating witness for the government, he does not dispute the facts that form the elements of the offenses to which he has plead guilty. Essentially, those facts demonstrate that between December 15, 2011 and January 24, 2012, Mr. Jones and his co-defendant Meaghan Murphy participated in a conspiracy to distribute crack cocaine, which included three sales of crack cocaine to that confidential witness. Specifically, on December 15, 2011, that confidential witness purchased 28 grams of crack cocaine from Ms. Murphy at 122 Melville Street, Fall River, MA. PSR ¶¶ 17-20. On January 2, 2012, the confidential witness purchased 27.5 grams of crack cocaine from Mr. Jones at the same location. PSR ¶¶ 21-26. And on January 24, 2012, the confidential witness purchased 27.9 grams of crack cocaine from Ms. Murphy. Id. ¶¶ 28-31. The latter two sales (one involving Mr. Jones and one involving Ms. Murphy) were videotaped.

On January 24, 2012, shortly after the second sale involving Ms. Murphy, officers executed a search warrant at 122 Melville Street. Id. ¶ 32. At the time of the search, Mr. Jones

was in the apartment and he was arrested.  During the course of the search, agents seized, inter alia, a red cooler containing 607.4 grams of crack cocaine.  Id. ¶ 33.

On June 19, 2013, Mr. Jones pled guilty to the five charges in the Indictment: one count of conspiracy to distribute at least 280 grams of cocaine base, in violation of 21 U.S.C. § 846; three counts of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1); and one count of possession with intent to distribute at least 280 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1).

On May 3, 2013, Mr. Jones' co-defendant Meaghan Murphy pled guilty to the same five charges as those faced by Mr. Jones.  PSR ¶ 7.  Ordinarily, that plea would have subjected Ms. Murphy to the same ten-year mandatory minimum sentence that Mr. Jones faces in this case. Indeed, Ms. Murphy, like Mr. Jones, had one prior conviction for drug distribution.  See Docket Entry # 17 (describing 2005 conviction of Ms. Murphy for possession with intent to distribute cocaine and conspiracy to violate the Controlled Substances Act).  However, because Ms. Murphy apparently received a relatively lenient sentence for that prior drug conviction, Ms. Murphy remained eligible for a "safety valve" proffer, and this Court was authorized to sentence her for a term of years below the mandatory minimum.  See 18 U.S.C. § 3553(f).  Accordingly, on July 26, 2013, this Court sentenced Ms. Murphy to a term of 60 months custody, followed by three years of supervised release.

Because of the length of Mr. Jones' prior sentence, Mr. Jones is not eligible for the "safety valve" under current law.  Accordingly, absent a change in that law, Mr. Jones is subject to a ten year mandatory minimum sentence in this case.

## THE SENTENCING GUIDELINES

The parties have several significant disputes regarding the proper calculation of the defendant's offense level and criminal history category under the United States Sentencing Guidelines.  The PSR has calculated Mr. Jones' final offense level as **35** and his criminal history category as III, resulting in a sentencing range of 210 to 262 months.  PSR ¶ 92.  Mr. Jones, on the other hand, contends that his final offense level should be **29** and that his criminal history category is II, resulting in a sentencing range of 97 to 121 months.  See Objections # 21.  The legal and factual issues underlying these disputes are set forth briefly below.

### A.    The Defendant's Offense Level

With respect to Mr. Jones' offense level, the PSR concludes that Mr. Jones is responsible for more than 840 grams of cocaine base, resulting in an initial offense level of **34.**  PSR ¶¶ 42-43 (citing U.S.S.G. § 2D1.1(c)(3)).  The PSR then adds two points under U.S.S.G. § 2D1.1(a)(12) because it concludes that Mr. Jones "maintained a premises for the purposes of manufacturing or distributing a controlled substance."   PSR ¶ 44.  The PSR also adds an additional two points under U.S.S.G. § 3B1.1 because it concludes that Mr. Jones was an "organizer, leader, manager or supervisor" of the criminal activity under U.S.S.G. 3B1.1.  PSR ¶ 46.  After three points are deducted for Mr. Jones' acceptance of responsibility, the PSR determines that Mr. Jones' final offense level is **35**.  PSR ¶ 52.

Defendant disputes the applicability of several of the enhancements proposed in the PSR.  First, defendant contends that the drug quantity attributable to Mr. Jones is less than 840 grams of cocaine base, so his initial offense level should be **32.**  See Objections #8, #9.  Second, defendant contends that he neither "maintained a premises for the purposes of manufacturing or distributing a controlled substance" nor served as an "organizer, leader, manager or supervisor"

6

of the criminal activity.  See Objections #10, #11.  Indeed, neither of these two-level

enhancements appear to have been applied to his co-defendant, Ms. Murphy, who engaged in

essentially identical conduct.  Accordingly, defendant contends that his final offense level, after

deduction of the three acceptance points, is **29.**  See Objections # 12, #13.

Each of these disputed enhancements is addressed briefly below.

### 1.     The Drug Quantity Attributable to Mr. Jones

There is no dispute between the parties that the drug quantity attributable to Mr. Jones is

in excess of 280 grams of cocaine base.  Specifically, the amount of cocaine base involved in the

three transactions to which Mr. Jones has pled guilty, coupled with the amount of cocaine base

that was seized in connection with the search of the premises at 122 Melville Street totals 690.3

grams of cocaine base.  Mr. Jones has not objected to those amounts as described in the PSR.

See Objection #8 (arguing that the proper amount that is attributable to Mr. Jones is 690.3

grams).

However, the PSR contends that the total amount of cocaine attributable to Mr. Jones

exceeds 840 grams by citing loosely to statements allegedly made by the confidential witness

regarding other purchases "from the defendant and others" during the year prior to the offense

conduct.  See Response to Objection #8.  Critically, the PSR references no specific transactions

that would justify this additional 150 grams, only a contention that adding an additional 150

grams to Mr. Jones' total is "a conservative estimate."  Id.  Finally, the evidence that it *does*

cite— statements made by the cooperating witness—fails to explain why these earlier amounts

should be attributed solely to Mr. Jones and *not* to Ms. Murphy (who is described among the

"others" from whom the confidential witness supposedly had purchased cocaine during these

prior periods).  Indeed, as discussed below, the different approaches taken to the drug quantity

calculations for the two defendants in this case presents significant disparity issues that argue for more lenient treatment of Mr. Jones. See 18 U.S.C. § 3553(a)(6); see also United States v. Quinn, 472 F. Supp. 2d 104, 112 (D. Mass. 2007) (finding unwarranted sentencing disparity would result if court took different approach to drug quantity calculations for two defendants charged in the same conspiracy).

Regardless, Mr. Jones disputes the contention that more than 840 grams of cocaine base is attributable to him in this case. There is insufficient evidence to support a finding that he is responsible for that amount. Accordingly, his base offense level should be **32**, not **34**.

### 2.   Mr. Jones Did Not "Maintain" the Premises at 122 Melville Street

Nor is there sufficient evidence to support the application of the two-point enhancement under U.S.S.G. § 2D1.1(b)(12). Specifically, although there is evidence that *both* Mr. Jones and Ms. Murphy distributed cocaine base from the apartment at 122 Melville Street, there is no evidence that Mr. Jones "maintained" that premises. Mr. Jones did not own that property, nor did he hold the lease there. And while certainly both he and Ms. Murphy appear to have had access to the premises at times, see PSR ¶ 20 (describing Ms. Murphy as having a key to the apartment), such access does not amount to the "maintenance" of the premises for the purposes of § 2D1.1(b)(2). Indeed, this Court has already concluded that Mr. Jones lacked standing to pursue a motion to suppress evidence obtained during the search of the premises. See Memorandum and Order of June 11, 2013.

Critically, the Probation Office's response to this objection appears to misread the language of the enhancement. Specifically, Probation argues that the enhancement applies because "there is evidence that the premises was maintained for the purpose of manufacturing or distributing a controlled substance." Response to Objection #10. But this use of the passive

voice omits the requirement of proof that "*the defendant maintained*" the premises for such purpose.  U.S.S.G. § 2D1.1(b)(12) (emphasis added).  As explained in the relevant application note, the questions to be considered here are "(A) whether the defendant held a possessory interest in (e.g. owned or rented) the premises *and* (B) the extent to which the defendant controlled access to, or activities at, the premises."  Id. at Application Note 17 (emphasis added). Here, it is undisputed that Mr. Jones neither owned nor rented the premises at 122 Melville.  See Order of June 11, 2013 ("Jones does not have ownership [of the apartment].").   Nor is there evidence that Mr. Jones "controlled access to, or activities at, the premises."  Indeed, the PSR itself describes multiple instances where Ms. Murphy entered and exited the premises entirely on her own accord.  See PSR ¶¶ 11, 12, 20, 29-31.  Under these circumstances, there is no basis to conclude that Mr. Jones "maintained" the premises at 122 Melville Street.  The § 2D1.1(b)(12) enhancement simply does not apply.

Finally, it bears emphasis that this enhancement was apparently *not* applied to Ms. Murphy, who clearly had equivalent access to the premises at 122 Melville Street as Mr. Jones and who engaged in the same conduct at the premises as Mr. Jones.  Compare PSR ¶¶ 24-26 (Jones) with PSR ¶¶ 29-31 (Murphy).   Moreover, there is no dispute that Ms. Murphy had a key to the apartment.  PSR ¶ 20.  Indeed, based on the evidence submitted by the government, Ms. Murphy appears to have been present at the 122 Melville Street location at least as frequently than Mr. Jones (Ms. Murphy conducted two of the charged sales at the location, while Mr. Jones only conducted one).  Under these circumstances, it is difficult to understand how this enhancement can be applied to Mr. Jones and not to his co-defendant.

**3.**     **Mr. Jones was Not An "Organizer, Leader, Manager or Supervisor" under U.S.S.G. § 3B1.1.**

Mr. Jones also disputes the PSR's conclusion that he was an "organizer, leader, manager, or supervisor" of the criminal activity at issue in this case.  See U.S.S.G. § 3B1.1.  As the PSR makes clear, he and Ms. Murphy were partners in this criminal endeavor—engaging in essentially identical conduct.  Both were charged with precisely the same offenses, and indeed both were videotaped making nearly identical sales to the same confidential witness.  See PSR ¶¶ 25-26, 29-31.  Both defendants had equal access to the red cooler which contained a large quantity of cocaine, and both defendants engaged in the unlawful transactions with the confidential witness.  See PSR ¶ 25 (Jones); ¶ 30 (Murphy).

Despite this evidence, the PSR concludes that Mr. Jones was "the contact and supplier of the drugs purchased during the instant offense."  See Response to Objection # 11.  Mr. Jones disputes those contentions.  In fact, the evidence in this case indicates that Mr. Jones and Ms. Murphy were partners, and that neither exerted control over the other.  There is little suggestion that Ms. Murphy was controlled in any way by Mr. Jones.  In the videotaped sale on January 24, 2012, Ms. Murphy takes the order from the customer, collects the money for the sale, and distributes the crack cocaine from a larger quantity she was handling—all outside the presence of Mr. Jones.  PSR ¶¶ 29-30.  And when she was arrested later that day, she was still in possession of the "buy money."  Id. ¶ 35.  Under these circumstances, there is no basis to find that Mr. Jones was an "organizer, leader, manager or supervisor" under U.S.S.G. § 3B1.1.  See United State v. Katora, 981 F.2d 1398, 1402-03 (3d Cir. 1992) (finding that § 3B1.1 enhancement is inapplicable when two defendants "shared responsibility" for the offense); see also United States v. Greenfield, 44 F.2d 1141, 1145-46 (2d Cir. 1995) (role enhancement under § 3B1.1 inappropriate where defendants were "equal partners" and did not supervise any third party).

10

B.   **Mr. Jones' Criminal History Category**

Finally, Mr. Jones objects to the conclusion in ¶ 57 of the PSR that at the time of the instant offense he was "under the criminal justice sentence imposed on June 28, 2006 in the United States District Court for the Eastern District of North Carolina."  PSR ¶ 57.  This conclusion adds two points to Mr. Jones' criminal history calculation, moving him from criminal history category II to criminal history category III.

There is no dispute Mr. Jones' supervised release for the North Carolina offense terminated on December 13, 2011.  See PSR ¶ 54.  His offense conduct in this case commenced two days later, on December 15, 2011, with the first of three sales to the confidential witness.  See PSR ¶¶ 17-20.  While the gap between these two dates is obviously narrow, it is meaningful for the purposes of the sentencing guidelines: § 4A1.1(d) applies only if the defendant commits the instant offense "*while* under any criminal justice sentence, including . . . supervised release."  U.S.S.G. § 4A1.1(d) (emphasis added).  This bright line rule is unambiguous: if the offense occurs within the supervised time period, then two points are added—if not, then the provision simply does not apply.

The PSR attempts to circumvent this rule by noting that the Indictment alleges that the conspiracy commenced in November 2011.  See Response to Objection #16.  But the question here is when "the defendant committed the offense," U.S.S.G. § 4A1.1(d), not the Indictment's general allegations regarding the timing of the conspiracy.  Here, the only evidence reflecting wrongful conduct by Mr. Jones prior to the December 15, 2011 transaction appears to be based on disputed statements made by the confidential witness.  By contrast, the conduct that is actually attributable to Mr. Jones—his commission of the offense—commenced on December 15, 2011—*after* his supervised release had terminated.

Accordingly, the two point enhancement under § 4A1.1(d) does not apply, and Mr.

Jones' total criminal history points should be 3, resulting in a Criminal History Category of II.

## CONSIDERATION OF THE PURPOSES SET FORTH IN 18 U.S.C. § 3553(a)

Of course, the calculation of the sentencing range established by the United States

Sentencing Guidelines is only one of the factors that this Court must consider when fashioning

an appropriate sentence for Mr. Jones in this case.  In addition to the guidelines, this Court must

consider all of the purposes identified under 18 U.S.C. § 3553(a), including, *inter alia*, the nature

and circumstances of the offense, the history and characteristics of the defendant, the need for

the sentence to reflect the seriousness of the offense, to afford adequate deterrence to criminal

conduct, and (perhaps most relevant here) "to avoid unwarranted sentencing disparities among

similar defendants with similar records who have been found guilty of similar conduct."  See 18

U.S.C. § 3553(a)(6).

In this case, the Court has already concluded that a 60-month sentence for Ms. Murphy

satisfies the requirements of § 3553(a).  In imposing that sentence, the Court necessarily found

that a 60-month sentence appropriately reflected the seriousness of the offense, promoted the

respect for the law, and provided just punishment for the offense.  Indeed, this was so even

though it appears that the sentence for Ms. Murphy was below her otherwise applicable guideline

range.

Under current law, Mr. Jones now faces a far stiffer sentence than that faced by Ms.

Murphy: 120 months.  Plainly, such a sentence would appropriately reflect the seriousness of the

offense, promote respect for the law, and provide more than enough punishment for the offense.

18 U.S.C. § 3553(a)(1-3).  Most significantly, Mr. Jones respectfully submits that, in light of the

sentence already imposed on Ms. Murphy, any sentence longer than 120 months would be far

greater than necessary to achieve the purposes of the sentencing statute.  Indeed, any greater sentence would result in an unwarranted sentencing disparity that would be flatly inconsistent with § 3553(a)(6).

A.   **The Court Should Avoid An Unwarranted Sentencing Disparity with the Sentence Imposed Upon Ms. Murphy**

The sentencing statute requires this Court to "consider … the need to avoid unwarranted sentence disparities among defendants *with similar records who have been found guilty of similar conduc*t."  18 U.S.C. § 3553(a)(6) (emphasis added).  In this case, Mr. Jones was named in and pled guilty to the same five-count indictment as Ms. Murphy.  Factually, Murphy and Jones are implicated in precisely the same criminal conduct; and both Murphy and Jones have a single prior criminal conviction (both drug-related).  Despite these similarities, Jones is facing a sentence that will be (at a minimum) twice as long as the 60-month sentence received by Murphy.  While Mr. Jones acknowledges that the Court is currently obliged to impose a sentence of 120 months, he respectfully submits that any longer sentence would result in an unwarranted sentencing disparity wholly inconsistent with 18 U.S.C. § 3553(a)(6) and with basic principles of equity and fairness.

A review of Mr. Jones' PSR shows the extent to which Murphy was involved in the sale of narcotics both before and after December 15, 2011 — the date of the first charged conduct in this case.  According to the PSR, the government's cooperating witness purchased crack cocaine directly from Murphy at 122 Melville Street on a number of occasions before December 15, 2011.  PSR ¶ 16.  Murphy played a central role in two of the three controlled purchases that form the basis for Counts II, III and IV of the Indictment, often times entering 122 Melville Street by herself with her own key.  Id. ¶¶ 20, 21.  Moreover, just like Mr. Jones, Ms. Murphy was

captured on film retrieving a red cooler containing crack cocaine from a closet at 122 Melville Street.  Id. ¶¶ 29-30. .

Nor is there a sufficient difference between the "records" of these two defendants to merit such an enormous gap between their sentences.  Both Jones and Murphy each have just one prior criminal conviction (Murphy's prior matter was resolved in state court, whereas Jones was charged federally).  To be sure, Mr. Jones' prior offense resulted in a far more significant sentence—but that distinction does not merit the imposition of a sentence that is more than double that which Ms. Murphy received in this case. Plainly, the statutory minimum sentence of 120 months is more than adequate to promote the goals of incarceration while still accounting for any distinguishing factors that the Court believes may warrant a modestly longer sentence for Jones.[2]

Equally troubling for disparity purposes is the approach apparently taken by the PSRs with respect to these two defendants.  As explained above, Mr. Jones' PSR appears to take a very different approach to the drug quantity issue than that taken with respect to Ms. Murphy.  This is precisely the type of unwarranted sentencing disparity addressed by the Court in United States v. Quinn, 472 F. Supp. 2d 104 (D. Mass. 2007).  In that case, co-defendants pled guilty to the same information charging them each with possession with intent to distribute more than 500 grams of

---

[2] One additional sentencing disparity issue that may be relevant in this case is the potentially unwarranted disparity between the treatment of the male and female defendants in this case. Recent research focusing on the different treatment of men and women in the criminal justice system shows a significant difference in the treatment of men and women in the federal criminal justice system.  See Sonja B. Starr, Estimating Gender Disparities in Federal Criminal Cases, University of Michigan Law and Economics Research Paper Series (August 2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2144002.  The gap between treatment of the genders in federal cases is so large, that at least part of that gap may well be attributable to some forms of conscious or unconscious gender discrimination.  Id. at 16-17.  Such factors must be considered here, where Mr. Jones is confronted with a sentence that will be at least twice as long as his female co-conspirator.

cocaine.  472 F. Supp. 2d at 105.  Just as in this case, the two defendants were arrested after an

investigation, during which agents used a cooperating witness to carry out controlled purchases

of cocaine from the defendants.  Id.  Defendant one (a female) was sentenced first.   The

Probation Department attributed to her the drugs found on her person, at her residence, and at

defendant two's residence.  Id.  Her Guidelines sentencing range was 37-46 months in criminal

history category I.  Id.  Defendant two (a male) was sentenced one month after defendant one.

Id.  All of the drugs that Probation attributed to defendant one were also attributed to defendant

two.  Id.  Additionally, "[o]n the basis of information presented to the probation office by the

government, which came largely from the cooperating witness, the PSR authors estimated that

[defendant two] should be responsible for having bought and sold a kilogram of cocaine every

two weeks for three years."  Id. at 106-107.  Consequently, defendant two's "Guideline range for

imprisonment was 151-188 months" in criminal history category II.  Id.

      In analyzing what he referred to as "an anomaly" between these two defendants, Judge

O'Toole noted that:

> "[t]he range proposed in [defendant two's] PSR was driven not by the conduct in
> the offense of conviction, but by [defendant two's] past (uncharged) 'relevant
> conduct.'   In contrast, the range proposed by [defendant one's] PSR was
> essentially limited to the charged conduct, with no computational effect give to
> prior 'relevant conduct,' *even though some of that conduct was described in the
> report.*  If I were to accept the advice of the Guidelines as proposed for [defendant
> two], I would be agreeing to employ a method of determining his sentencing
> range that I did not employ when determining [defendant one's] range.  To do so
> would produced an 'unwarranted sentence disparit[y]' … and result in a sentence
> that could fairly be called 'unreasonable.'

Id. at 112 (emphasis supplied).  In light of this "anomaly," the court sentenced the second

defendant to 60 months imprisonment and four years of supervised release.  Id. at 113.

      In all meaningful respects, this case is indistinguishable from Quinn.  Jones and Murphy

have pled guilty to the same five-count indictment.  Their charged conduct is essentially

identical.  And yet, their proposed Guidelines ranges are widely disparate because their PSRs appear to take different approaches to their respective guidelines calculations.  Attributing certain enhancements to Jones and not Murphy is improper and would produce an unwarranted sentence disparity in violation of 18 U.S.C. § 3553(a)(6).  See Quinn, 472 F. Supp. 2d at 105.  For this reason, a sentence in excess of the 120-month statutory minimum is demonstrably unreasonable.

      **B.**    **The Distinction Between Crack Cocaine and Powder Cocaine in the Sentencing Guidelines and 21 U.S.C. § 841 Creates Additional Sentencing Disparities that Unfairly Affect Mr. Jones.**

      Nor is the potential disparity with Ms. Murphy's sentence the only potential unwarranted sentencing disparity at issue in this case.  As this Court likely knows, the Fair Sentencing Act of 2010 reduced the ratio of powdered cocaine to crack cocaine set forth in the Guidelines and in 21 U.S.C. § 841(b) from 100:1 to 18:1.  Although this change was certainly an improvement, the Act did not eliminate all unwarranted sentencing disparities between defendants charged with crack cocaine offenses and those charged with offenses involving powdered cocaine.  Indeed, even before passage of the Fair Sentencing Act, the U.S. Supreme Court held that district court judges could properly deviate from the Guidelines in order to avoid unreasonably long sentences caused by the Guideline's unnecessarily severe treatment of crack cocaine compared to powdered cocaine.  See United States v. Kimbrough, 552 U.S. 85, 108 (2007), Spears v. United States, 555 U.S. 261 (2009); accord 18 U.S.C. § 3553(a)(6).  Stated differently, the Court in Kimbrough held that "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case."  552 U.S. at 89.

Since the Fair Sentencing Act became law, numerous district courts have continued to reject the Guideline's 18:1 ratio in favor of a more equitable ratio—in many cases a 1:1 ratio—in order to avoid unwarranted sentencing disparities.  See e.g., United States v. Williams, 788 F. Supp. 2d 847, 891-92 (N.D. Iowa 2011) (sentencing defendant convicted of crack offense according to 1:1 ratio); United States v. Shull, 793 F. Supp. 1048, 1064 (S.D. Ohio 2011) (rejecting 18:1 ratio by sentencing defendant to statutory minimum and significantly below Guideline range); United States v. Whigham, 754 F. Supp. 2d 239, 246-47 (D. Mass. 2010) (categorically imposing a 1:1 ratio in all cases involving crack cocaine offenses).  The rationale behind eliminating the disparity between crack and powder sentences is well documented. Among other things, assumptions about the "relative harmfulness of crack and powder cocaine have not been borne out by the evidence."  Whigham, 754 F. Supp. 2d at 246 (internal citations omitted).  Furthermore, "the crack/powder disparity fosters disrespect for and mistrust in the criminal just system because of its disproportionate impact on African American defendants" like Mr. Jones.  Id. (internal citations omitted).

Mr. Jones' base offense level is either 32 or 34.  See PSR ¶ 43 & Objection #9 thereto. The PSR's calculation assumes that Jones is responsible for at least 840 grams of cocaine base.[3] Id.; U.S.S.G. § 2D1.1.  In order to trigger the same offense level using powdered cocaine, Mr. Jones would have had to possess *at least 15,000 grams* (15 kilograms) — the street value of which far exceeds that of 840 grams of cocaine base.  Alternatively, if cocaine base was treated the same as powder cocaine under the Guidelines, Mr. Jones' base offense level would be 26 (at least 500 grams, but fewer than 2 kilograms).  Id.   If, as Defendant contends, no other

---

[3] As described *supra*, Jones disputes the drug weight calculated in the PSR and the resulting base offense level.  There is no reasonable basis to attribute to Jones more than 840 grams of cocaine base.  Accordingly, Mr. Jones contends that his base offense level should 32.

enhancements apply and Mr. Jones has a criminal history category of II, his final offense level

would be 23 and his applicable sentencing range would be **51 to 63 months**.

Moreover, even if every one of the PSR's other guidelines enhancements were accepted,

an application of a 1:1 crack/powder ratio would leave Mr. Jones with a final offense level of 27

and a criminal history category III.  Under those circumstances, Mr. Jones' guideline sentencing

range would be **87 to 108 months**—a range that is still one year lower than the mandatory

minimum sentence that Mr. Jones is now facing.[4]

Quite clearly, the crack/powder distinction inherent in the Guidelines and in 21 U.S.C. §

841 unfairly adds years of incarceration to Mr. Jones' sentence.  This is true despite failing

support for the notion that crack cocaine is (or has ever been) more dangerous or insidious than

powdered cocaine.  The only real effect of the crack/powder distinction is to foster disrespect for

the criminal justice system by unfairly punishing African American defendants like Mr. Jones.

Absent a change in the law, there is no getting around the ten-year mandatory minimum

sentence in this case.[5]  However, to the extent this Court is considering imposing a sentence in

excess of that statutory minimum, Mr. Jones asks that the Court to consider the crack/powder

distinction in the Guidelines (and in the United States Code) and the unfair and unwarranted

sentencing disparities it produces.   But for that unwarranted distinction, Mr. Jones would be

---

[4]  Of course, if cocaine base was treated the same as powdered cocaine under 21 U.S.C. § 841,
Mr. Jones would *not* be subject to a ten-year mandatory minimum sentence.

[5] As noted in Mr. Jones' Motion to Continue his Sentencing, there is bi-partisan legislation
pending before the U.S. Senate and House of Representatives that would enable district court
judges to disregard statutory minimum sentences for certain defendants in some cases.  If
enacted into law, it is likely that Jones would qualify for relief under this proposed legislation
(the Justice Safety Valve Act of 2013).  As of the date of this sentencing, however, this proposed
legislation has not been enacted into law.

entitled to an incarcerated sentence of significantly less than ten years.  Accordingly, a sentence greater than ten years in this case would be inconsistent with § 3553(a)(6).

C.     **Additional Proposed Changes in the Law and in the Policies of the United States Department of Justice Threaten to Create Additional Unwarranted Sentencing Disparities as to Mr. Jones.**

On August 12, 2013, Attorney General Eric Holder announced a major shift in criminal justice policy.  To ease overcrowding in federal prisons and racial disparities, both products of the so-called "war on drugs," the Department of Justice's new policy requires prosecutors to sidestep mandatory minimums in appropriate cases.  See Memorandum to the United States Attorneys and Assistant Attorney General for the Criminal Division (Aug. 12, 2013).  In his speech announcing this new policy, Attorney General Holder recognized a "vicious cycle of poverty, criminality, and incarceration that traps too many Americans and weakens too many communities."  Attorney General Eric Holder's Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013).[6]  In his remarks, Attorney General Holder noted the "significant economic burden – totaling $80 billion in 2010 alone" imposed by the current incarceration scheme, and emphasized the shame in the fact that "black male offenders have received sentences nearly 20 percent longer than those imposed on white males convicted of similar crimes." Id. at 4.  He then outlined the new policy and stressed that offenders need to be rehabilitated, not warehoused and incapacitated.  Id. at 2.

Attorney General Holder also explained that mandatory minimums in drug-related crimes can be counterproductive and have long-lasting impacts on communities, particularly communities of color:

---

[6]*Available at* www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html.

> We will start by fundamentally rethinking the notion of mandatory minimum
> sentences for drug-related crimes.  Some statutes that mandate inflexible
> sentences – regardless of the individual conduct at issue in a particular case –
> reduce the discretion available to prosecutors, judges, and juries.  Because they
> oftentimes generate unfairly long sentences, they breed disrespect for the system.
> When applied indiscriminately, they do not serve public safety.  **They – and
> some of the enforcement priorities we have set – have had a destabilizing
> effect on particular communities, largely poor and of color.  And, applied
> inappropriately, they are ultimately counterproductive**.

Remarks at 3.  As Attorney General Holder also noted in his remarks, states that have decreased

their prison populations in response to concerns about the effectiveness of lengthy incarceration

and funding concerns have "seen drops in recidivism rates."  Id. at 5.  There is little doubt that a

massive sentence for Mr. Jones would gravely threaten his ability to be a productive citizen,

present father, and invested community participant when he is released.

 Nor are the announcements by Attorney General Holder the only changes on the horizon.

On July 31, 2013, Senators Richard Durbin (D-IL) and Michael Lee (R-UT) introduced

bipartisan criminal justice legislation proposing to modify 21 U.S.C. § 841(b)(1) to reduce all

current ten-year mandatory minimums to five-years, and to reduce all current five-year

mandatory minimums to two years. See Smarter Sentencing Act of 2013 (the "SSA"), S. 1410,

113th Cong. (2013). Stated more starkly, under the SSA, a defendant, like Mr. Jones, who is

charged with 280 grams of crack cocaine would be subject to a *five*-year mandatory minimum,

not a ten-year mandatory minimum.

 The stated purpose behind the SSA is "to focus limited Federal resources on the most

serious offenders." Id.[7]  Importantly, the bill also includes a directive to the Sentencing

Commission to make the sentencing guidelines "consistent with the amendments made by

---

[7] This bill compliments another bipartisan bill introduced by Senator Patrick Leahy (D-VT) and
Senator Rand Paul (R-KY).  This bill would give federal judges the discretion to go below any
mandatory minimum.  Justice Safety Valve Act of 2013, S. 619, 113th Cong. (2013).

sections 2 and 4 of this Act" and to decrease the penalties "in accordance with the amendments made by section 4 of this Act." S.1410. Thus, if the SSA becomes law, the Sentencing Guidelines would be reduced to reflect the two- and five-year mandatory minimums contained in the SSA.

While passage cannot be assured, the SSA has engendered a significant groundswell of support. The bill not only has bi-partisan sponsorship in both chambers of Congress, but has been endorsed by a wide range of unlikely parties, including the federal prison guard union (AFGE) and the American Correctional Association (ACA), the largest international correctional association in the world. Moreover, on July 17, 2013, fifty-three former federal judges and prosecutors wrote a letter endorsing the SSA. See Letter to Senators Durbin and Lee (July 17, 2013).[8] The letter identifies the SSA's "reduction of some mandatory minimums for nonviolent drug offenses" as an appropriate way to reduce spending on incarceration and "allow courts to make individualized assessments in nonviolent drug cases." Id.

In sum, during recent months, a clear consensus has begun to emerge among both houses of Congress and the Department of Justice: drug sentences are too long. To account for this rapidly changing sentencing landscape, this Court should consider the impending changes as a factor under 18 U.S.C. § 3553(a). Such consideration would avoid unwarranted sentencing disparities between Mr. Jones and future similarly situated defendants, as well as recognize the largely non-violent and non-aggravating circumstances of his crime. At a minimum, these changes strongly suggest that Mr. Jones should not be subjected to a sentence any greater than 120 months.

---

[8] *Available at* http://sentencing.typepad.com/sentencing_law_and_policy/2013/07/former-federal-prosecutors-endorse-safety-valve-support-grows-for-mandatory-minimum-sentencing-refor.html

## CONCLUSION

For all the foregoing reasons, Mr. Jones respectfully requests that this Court impose upon him a sentence of incarceration that is no greater than one hundred and twenty (120) months, to be followed by a six year term of supervised release.  Mr. Jones further requests that, in connection with any sentence to be imposed, the Court recommend that he be placed in a facility that is as close as possible to his family in Brooklyn, New York, and that the Court further recommend that he be admitted to a 500-hour substance abuse treatment program.  Finally, in light of his inability to pay any fine, Mr. Jones respectfully requests that this Court decline to impose any fine in connection with this case, other than the mandatory special assessment.

Respectfully submitted,

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty (BBO #565772)
COLLORA LLP
100 High St., 20th Floor
Boston, MA  02110
(617-371-1003)
dcloherty@collorallp.com

*Counsel for Defendant Byron Jones*

Dated:  October 13, 2013

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 13, 2013.

*/s/ Daniel J. Cloherty*

22