```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
     v.                       )    Cr. No. 12-10084-PBS
                              )
1.   BYRON JONES,             )
     Defendant                )
```

### GOVERNMENT'S SENTENCING MEMORANDUM

On June 19, 2013, Byron Jones (hereinafter "Jones" or the "defendant") pleaded guilty to conspiring to distribute 280 grams or more of cocaine base, possession with intent to distribute 280 grams or more of cocaine base, and three counts of distribution of cocaine base. The Pre-Sentence Report ("PSR") prepared by the United States Probation Office, dated October 10, 2013, calculated the defendant's guideline sentencing range (GSR) as 210-262 months.

For reasons to be discussed in greater detail at the defendant's sentencing hearing, the government recommends that the Court sentence the defendant to 188 months in prison. The government also requests that the defendant be ordered to pay a $20,000 fine (a fine at the low end of his applicable guideline range) and be placed on supervised release for five years.

This is the defendant's second federal conviction for trafficking in large quantities of crack cocaine. The defendant engaged in crack sales while on supervised release for his first

federal conviction.  He directed others to deliver crack cocaine to customers (including one customer who became a cooperating witness with the DEA).  When agents arrested him, he was in possession of over a half-kilogram of crack cocaine, nearly a half-kilo of powder cocaine, and was in the process of cooking cocaine into crack.  The lengthy sentence proposed by the government will specifically deter the defendant (if that is possible), promote respect for the law, and protect the public.

## BACKGROUND

Jones's First Federal Conviction.  On April 30, 1992, officers from the Charlotte, North Carolina Police Department obtained an arrest warrant for the defendant.  See United States v. Byron Jones, 1994 WL 8118 (4th Cir. 1994) at *1.  Several witnesses identified the defendant as the perpetrator of three violent assaults:  the defendant shot one man with a handgun; he abducted a second man at gunpoint; and he ran two other men off the road, chased them, and shot at them.  Id.  Officers arrested the defendant and obtained a search warrant to search his apartment for guns and shell casings.  Id.

Inside the defendant's apartment, officers found crack cocaine, plastic baggies, two assault rifles, two 9 millimeter handguns, and a large quantity of ammunition.  Id.  At his trial, witnesses described how the defendant distributed large quantities of crack cocaine and how he was often armed with a

firearm to protect his drug stash and associates.  Id. at *3. The trial included testimony of at least one shootout involving the defendant.  Id.  The trial also included testimony of two female co-conspirators of Jones.  Id.  The women testified that they distributed large quantities of crack for Jones and stored drugs and guns for him.  Id.  One testified that she frequently traveled to New York with Jones, who was in possession of crack cocaine and cash during the trips.  Id.  The defendant was convicted and initially sentenced to 420 months in prison.  Id. at *4.  He was later re-sentenced to 204 months.  PSR, ¶ 54.

Jones and the Fall River Stash House.  In October and November, 2011, the Barnstable Police Department used a confidential informant (CI-1) to make several crack cocaine purchases from a female Cape Cod drug dealer who ultimately became a cooperating witness (CW-1).  PSR, ¶ 10.  In order to identify CW-1's suppliers, officers began to follow CW-1 before she met with CI-1.  Id.  On November 7, 2011, officers saw Jones meet CW-1 at the Fall River stash house.  Id.  After meeting with Jones, CW-1 sold an ounce of crack cocaine to CI-1.  Id.

Barnstable Police, now aided by the Drug Enforcement Administration, directed CI-1 to introduce an undercover police officer (UC) to CW-1.  Id., ¶ 11.  On November 21, 2011, the UC bought 25.4 grams of crack cocaine from CW-1.  Id.  Before the sale to the UC, CW-1 met Murphy at the stash house.  Id.

3

On December 8, 2011, agents followed CW-1 from Cape Cod to the stash house. Id., ¶ 12. CW-1 met with Murphy and then drove back toward Cape Cod. Id. Agents pulled CW-1 over and seized 63 grams of crack cocaine from CW-1. Id. Thereafter, CW-1 agreed to cooperate against Jones. Id.

CW-1 advised agents that for about a year, it had been purchasing two – three ounces of crack cocaine at a time, several times a week from Jones at the Fall River stash house. Id., ¶ 13. CW-1 correctly identified photographs of Jones; Jones's brother, Carlton; Jones's girlfriend, Jeanine Jackson; and Meaghan Murphy. Id., ¶ 13. CW-1 advised that Jones regularly went to New York to pick up cocaine. Id. CW-1 provided agents with Jones's cellular telephone number.[1]

Jones Asks for Early Termination of His Supervised Release. On September 19, 2011, Jones requested that his supervised release be terminated early because he was providing for his family, was volunteering, and had a sick mother in New York to take care of. United States v. Byron Jones, No. 10-00038-SJ (E.D.N.Y. filed Sept. 19, 2011), docket entry 11. On December 13, 2011, a judge granted Jones's request for early termination of his supervised release. Id., docket entry 15 ("This outcome

---

[1] During the investigation, agents obtained a warrant for precision location information for Jones's cell phone which showed him in the New York area for several days before agents executed the search warrant for the stash house. PSR, ¶ 27.

4

not only comports with [18 U.S.C.] §3583(e)'s mandate that 'such [termination be] warranted by the conduct of the defendant and the interests of justice,' but also takes into account the impact of the current fiscal crisis on the Probation Department, whose resources would be better applied to the supervision of individuals more likely to re-offend than Jones appears to be").

<u>The Controlled Purchases</u>.  On December 15, 2011 – two days after being granted early termination of supervised release – Jones took an order for an ounce of crack cocaine via text from CW-1.  <u>Id.</u>, ¶ 17.  Thereafter, Murphy delivered an ounce of crack cocaine to CW-1 at the defendant's stash house in Fall River.  <u>Id.</u>, ¶¶ 19-20.  On January 2, 2012, CW-1 again ordered an ounce of crack from Jones via text message.  <u>Id.</u>, ¶ 21.  This time, Jones himself handed the crack to CW-1 inside the stash house.  <u>Id.</u>, ¶ 25.  After the crack sale, Jones had a twenty minute recorded conversation with CW-1 where Jones talked about his plans to obtain a liquor license in New York and his relationship with his girlfriend.  <u>Id.</u>, ¶ 26.  On January 13, 2012, CW-1 again ordered an ounce of crack from Jones via text. <u>Id.</u>, ¶ 28.  Murphy delivered the crack to CW-1 at the stash house.  <u>Id.</u>, ¶ 30.  The meeting lasted four minutes.  <u>Id.</u>

<u>The Search</u>.  After the third controlled purchase, agents executed a series of search warrants and arrest warrants for Jones and Murphy.  When agents executed the search warrant at

5

the stash house, they found Jones inside.  Id., ¶ 32.  Jones was in his boxers and told agents that he was "just looking at the place."  Id.  In the stash house, agents seized a total of 610.7 grams of crack cocaine, 498.9 grams of powder cocaine, a respirator, a digital scale, cell phones, and boxes of sandwich bags.  Id., ¶ 33.  Agents also observed a pot with simmering water, a spoon, and crack cocaine in the kitchen.  Id., ¶ 34.  Both the pot and the spoon had cocaine residue on them.  Id.  In other words, at the time the warrant was executed, Jones was cooking cocaine into crack.  Id.

**ARGUMENT**

Probation concluded that at least 840 grams of cocaine base was reasonably attributable to Jones.  PSR, ¶ 43.  Probation assessed a two-level enhancement because the defendant maintained a drug house and a two-level role enhancement because the defendant was a leader or manager of the drug trafficking conspiracy.  Id., ¶¶ 44, 46.  Thus, Probation found the defendant's total offense level (TOL) was 38.  Id., ¶ 48.

Probation also concluded that the defendant was in criminal history category (CHC) III.  In addition to his 204 month conviction, which generated 3 criminal history points, Probation concluded that the defendant engaged in the instant offense while still on supervised release in New York.  Id., ¶¶ 54, 57.  This yielded a GSR of 210-262 months.  Id., ¶ 92.

6

The defendant challenges Probation's offense level and criminal history calculation.  Both challenges fail.  To begin, the defendant (and, to a lesser extent, Probation) undercount the amount of crack cocaine seized during the investigation:

| | |
|---|---|
| 28.0 grams | 11.7.11 sale by CW-1 to CI-1 (PSR, ¶ 10) (weight approximate) |
| 25.4 grams | 11.21.11 sale by CW-1 to UC (PSR, ¶ 11) |
| 63.0 grams | 12.8.11 seizure from CW-1 after CW-1 drove to stash house (PSR, ¶ 12) |
| 27.5 grams | 12.15.11 controlled purchase by CW-1 |
| 27.5 grams | 1.2.12 controlled purchase by CW-1 |
| 27.9 grams | 1.13.12 controlled purchase by CW-1 |
| 610.7 grams | 1.13.12 seizure from stash house |

810 grams of cocaine base

Second, in addition to the 610.7 grams of crack cocaine seized from the stash house, agents also seized 498.9 grams of powder cocaine.  At the time the warrant was executed, agents saw that the defendant was in the process of cooking crack cocaine in the stash house.  CW-1 advised that it had purchased crack cocaine from Jones for a year.  All of the seized drugs in this case involved crack cocaine.  In short, the correct way to view the 498.9 grams of powder cocaine seized from the stash house is that it was not-yet-cooked crack cocaine.  See United States v. Hunter, 145 F.3d 946, 952 (7th Cir. 1998) (district court took original weight of powder cocaine, subtracted for impurities, subtracted for "worst case cooking scenario," and converted powder cocaine weight to crack).  In this case, the

7

cocaine seized from the stash house was determined to be 85% pure. PSR, ¶ 33. Using the formula set out in Hunter, if the Court subtracted 15% for impurities and assumed (in a worst-case scenario for the government) that another 30% would be lost in conversion, the 498 grams of powder cocaine would yield approximately 273 grams of crack cocaine.[2]

Third, CW-1 advised that it had been purchasing 2-3 ounce of crack from Jones and others at the stash house several times a week for a year. PSR, ¶¶ 13-16. During the investigation, agents sufficiently corroborated CW-1's information to deem this information reliable (at least reliable enough to get from 810 to 840 grams). As set out in the PSR, CW-1's controlled purchases were routine, even humdrum, events. During the second controlled purchase, Jones talked to CW-1 at length, in the stash house, after the sale was complete. Jones talked about his plans to obtain a liquor license for a business in New York and about difficulties he had with his girlfriend. Id., ¶ 26. In short, Jones had the kind of conversation with CW-1 that only occurs in the context of an established relationship (like the

---

[2] Murphy was "on notice" that there would be other drugs in the stash house and was thus properly held accountable for the powder cocaine in the apartment. It would not be appropriate to hold Murphy accountable for the "converted" powder-to-crack amount: the powder and crack cocaine were seized in different bags in the apartment and there was no evidence that Murphy knew how much powder cocaine was in the stash house.

year-long buyer-seller relationship described by CW-1, augmented by CW-1's personal relationship with Jones's brother). Given all of this, Probation's decision to hold Jones accountable for 840 grams of crack cocaine appears reasonable.

Probation's decision to assess the defendant a two-level role enhancement for being a leader or manager was also correct. In addition to CW-1's information about Jones, PSR, ¶¶ 13-16, agents determined that he took the orders for all three crack sales via text message. On two of the three sales, Jones (at the time of the offense, a 38 year old man who had served a lengthy federal sentence for drug trafficking) sent Murphy (a 23 year old woman) to deliver the drugs to CW-1. Jones was cooking crack cocaine at the time agents executed the search warrant at the stash house. No evidence of drug trafficking was seized from Murphy's apartment. CW-1 advised that while it had purchased crack from Jones at the stash house for a year, it had purchased from Murphy for a few months.

In other words, Jones exercised decision-making authority, recruited Murphy as an accomplice, and planned and controlled the offense. See U.S.S.G. § 3B1.1, Application Note 4. See also United States v. Berrios, 132 F.3d 834, 839 (1st Cir. 1998) (role enhancement appropriate when defendant was always the person contacted when heroin was purchased, always returned pager calls, and was the person who determined the location for

9

the drug sales); United States v. Cruz, 120 F.3d 1, 3-4 (1st Cir. 1997) (role enhancement proper when defendant used others as go-betweens in an effort to limit his involvement, wide age difference between defendant and runners, and controlled location where drug sales originated).  Probation was correct to apply the enhancement.

For many of the same reasons, Probation's enhancement for maintaining the stash house was likewise correct.  In addition to information from CW-1 (who advised that it bought crack from Jones at the stash house for a year but only bought crack from Murphy for a few months), the defendant's age, serious criminal history, and conduct during the drug sales all support the conclusion that he was in charge of the stash house at 122 Melville Street in Fall River.  When agents executed the warrant for the stash house, Jones was in his underwear, cooking crack in the kitchen.  Mail in Jones's girlfriend's name was also in the stash house.  Nothing of Murphy's was found in the stash house.  This evidence is more than sufficient to support the enhancement.

Finally, it cannot seriously be doubted that Jones sold crack cocaine while on supervised release – indeed, Jones sold crack while simultaneously trying to convince a federal judge to grant early termination of his supervised release.  CW-1 advised that Jones was running a large-scale drug trafficking enterprise

10

out of the stash house for over a year.  At a minimum, agents saw Jones or Murphy at the stash house before the CI and UC buys in November 2011, while the defendant was still on supervised release.  Probation correctly assessed Jones two criminal history points for selling crack while on supervised release and properly found that he belonged in CHC III, with an advisory GSR of 210-262 months.

**CONCLUSION**

The government's recommended 188 month sentence will generally deter others who engage in large-scale drug trafficking, specifically deter the defendant (who will be incapacitated until his mid-50s), promote respect for the law, and protect the public.  The government's recommendation is sufficient, but not greater than necessary, to achieve the goals of sentencing.  See 18 U.S.C. § 3553(a).

                                 Respectfully submitted,

                                 CARMEN M. ORTIZ
                                 UNITED STATES ATTORNEY

                    By: /s/ Christopher Pohl
                         Christopher Pohl
                         Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

    I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 16, 2013.

                                            /s/ Christopher Pohl
                                            Christopher Pohl
                                            Assistant U.S. Attorney