Case 1:12-cr-10084-PBS Document 182 Filed 02/20/15 Page 1 of 28

# United States Court of Appeals
## For the First Circuit

―――――――――――

No. 13-2358

UNITED STATES OF AMERICA,

Appellee,

v.

BYRON JONES,

Defendant, Appellant.

―――――――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

―――――――――――

Before

Selya, Circuit Judge,
Souter,[*] Associate Justice,
and Lipez, Circuit Judge.

―――――――――――

Jonathan Shapiro, with whom Harley C. Racer and Stern, Shapiro, Weissberg & Garin, LLP were on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

―――――――――――

February 20, 2015

―――――――――――

―――――――――

[*]Hon. David H. Souter, Associate Justice (ret.) of the Supreme Court of the United States, sitting by designation.

Case 1:12-cr-10084-PBS   Document 182   Filed 02/20/15   Page 2 of 28

**SELYA,** **Circuit Judge.** Following a failed motion to suppress, defendant-appellant Byron Jones pleaded guilty to an array of drug-trafficking charges. The defendant now challenges both his conviction and his 135-month sentence. His appeal requires us, inter alia, to construe and apply for the first time a sentencing enhancement for maintaining a premises for the purpose of manufacturing or distributing drugs. See USSG §2D1.1(b)(12). After careful consideration of all the issues against the backdrop of a scumbled record, we affirm.

## I. BACKGROUND

We briefly rehearse the genesis and travel of the case. In the fall of 2011, a Cape Cod drug dealer (whom for simplicity's sake we shall call CW) was under the watchful eye of the Drug Enforcement Administration (DEA). On November 7, local police observed CW meeting the defendant at an apartment in Fall River, Massachusetts before selling crack cocaine to a confidential informant. The surveillance team later saw the defendant's alleged coconspirator, Meaghan Murphy, enter and leave the apartment on several occasions.

Aware that the defendant previously had been convicted of drug-peddling charges, the DEA began monitoring the apartment. On November 21, the authorities saw CW meet Murphy at the apartment and then sell crack cocaine to an undercover police officer. CW again met Murphy at the apartment on December 8. Immediately after

this meeting, police officers detained CW and seized 63 grams of crack cocaine. At this point, CW began cooperating with the DEA.

On three occasions between December 15, 2011 and January 24, 2012, agents directed CW to contact the defendant by text message to set up controlled buys. These messages resulted in two sales by Murphy and one sale by the defendant himself. During two of the transactions, a video recording device captured footage of Murphy or the defendant retrieving drugs from a cooler inside the apartment.

On January 24, 2012, DEA agents, armed with search and arrest warrants, entered the apartment, found the defendant there, and arrested him. The ensuing search recovered over 600 grams of crack cocaine, nearly 500 grams of powdered cocaine, and extensive evidence that crack was being cooked and packaged on site.

In due season, a federal grand jury indicted Murphy and the defendant. The indictment charged the defendant with conspiracy to distribute controlled substances, possession of controlled substances with intent to distribute,[1] and three specific offense counts reflecting particular crack sales. See 21 U.S.C. §§ 841(a)(1), 846.

The defendant initially maintained his innocence and, in view of his indigency, a magistrate judge appointed counsel to

---

[1] This count referred to the contraband found at the apartment during the premises search.

-3-

Case 1:12-cr-10084-RBS  Document 182  Filed 02/20/15  Page 4 of 28

represent him.  See 18 U.S.C. § 3006A.  Within a matter of weeks, the defendant moved for the appointment of new counsel, accusing his original lawyer of failing to raise certain issues during detention proceedings.  On March 23, 2012, the magistrate judge granted the motion and replaced the first attorney with a second court-appointed attorney.

Slightly more than four months went by before the defendant again requested new counsel, this time citing a failure to communicate.  Once again, the magistrate judge obliged, replacing the second appointed attorney with yet a third appointed attorney (Daniel Cloherty).

Based on the travel of the case, the district court anticipated that the defendant would file a motion to suppress by March 15, 2013.  Instead, Attorney Cloherty moved to withdraw, asserting that there had been an irreparable breakdown in the lawyer-client relationship.  The district court probed this assertion over two days of hearings.  After determining that Attorney Cloherty and the defendant were communicating well enough to enable them to mount an adequate defense, the court denied the motion.  Notwithstanding warnings from the court about the perils of self-representation, the defendant elected to proceed pro se on the motion to suppress (with Attorney Cloherty as standby counsel).

The defendant proceeded to file his suppression motion.  Following an evidentiary hearing, the court rejected it.  The

defendant thereafter relinquished his pro se status and Attorney Cloherty resumed his role as defense counsel.

Eventually, the government and the defendant entered into a written plea agreement (the Agreement). The Agreement provided that the defendant would plead guilty to all five counts in exchange for the government's withdrawal of a sentence-enhancing information. See 21 U.S.C. § 851.

At the change-of-plea hearing, the court advised the defendant of the charges against him. The subsequent colloquy revealed that the defendant had a partial college education, knew how to read and write, and had read and understood the indictment and the Agreement. At the court's direction, the government recounted the factual basis for the charges. The prosecutor described the events leading up to the three controlled buys, the buys themselves, the search of the apartment, and the circumstances of the defendant's arrest. When the court asked the defendant whether he disagreed with any part of this factual narrative, he replied that he did not. The court then read the indictment aloud, and the defendant pleaded guilty to each and every count.

Following the defendant's plea to the conspiracy charge,[2] the court asked, "So you and Meaghan Murphy were in a conspiracy to distribute crack?"  The defendant responded in the affirmative.

The disposition hearing proved to be contentious.  The presentence investigation report recommended a two-level enhancement for maintaining the apartment as a stash house.  <u>See</u> USSG §2D1.1(b)(12).  It also recommended adding two points to the defendant's criminal history score for committing the offenses of conviction while on supervised release following his incarceration for an earlier crime.  <u>See</u> <u>id.</u> §4A1.1(d).  The district court resolved both disputed sentencing issues against the defendant.  These rulings combined to elevate the defendant's guideline sentencing range (GSR) to 135-168 months.[3]

The court sentenced the defendant to a bottom-of-the-range incarcerative term of 135 months.  This timely appeal ensued.

---

[2] The court stated in relevant part:

[F]rom a time unknown to the grand jury but from at least . . . November 2011, and continuing thereafter until in or about January 24, 2012, in Fall River and elsewhere, in the District of Massachusetts, [Byron Jones] and Meaghan Murphy did knowingly and intentionally combine, conspire, confederate and agree . . . to possess with intent to distribute and to distribute cocaine base and cocaine . . . .

[3] Without the stash house enhancement and the added criminal history points, the defendant's GSR would have been 97-121 months. Of course, that GSR would have been trumped by the 10-year mandatory minimum sentence that applied because the conspiracy involved more than 280 grams of crack cocaine.  <u>See</u> 21 U.S.C. § 841(b)(1)(A)(iii).

-6-

Case 1:12-cr-10084-PBS Document 182 Filed 02/20/15 Page 7 of 28

## II.  ANALYSIS

The defendant's counseled brief, filed by new appellate counsel, advances three principal claims of error.  In addition, the defendant has filed a pro se brief.  We consider the claims set forth in the defendant's counseled brief one by one and then deal with the claims raised in his pro se brief.  Finally, we tie up a loose end.

### A.  **The Guilty Plea**.

The defendant insists that his guilty plea should be vacated because it was not knowing and voluntary.  In his view, the district court failed adequately to apprise him of the nature of the charges.  Since the defendant did not challenge the integrity of his plea below, our review is for plain error.  See United States v. Vonn, 535 U.S. 55, 58-59 (2002).  To satisfy this exacting standard, the defendant must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

Federal Rule of Criminal Procedure 11(b)(1)(G) requires a district court, before accepting a guilty plea, to "inform the defendant of, and determine that [he] understands, . . . the nature of each charge to which [he] is pleading."  This rule exists "to

-7-

Case 1:13-cr-10084-PBS Document 182 Filed 02/20/15 Page 8 of 28

ensure that a defendant who pleads guilty does so with full comprehension of the specific attributes of the charge and the possible consequences of the plea." <u>United States</u> v. <u>Ramos-Mejía</u>, 721 F.3d 12, 14 (1st Cir. 2013) (internal quotation marks omitted).

The defendant identifies three ostensible shortcomings in the change-of-plea colloquy. He says that the court did not explain the elements that the government would have to prove to establish each of the five charges; that no one sufficiently described either the conspiracy or the events leading up to the controlled buys; and that the court neglected to explain the meaning of terms like "conspiracy" and "willfully and intentionally."

The defendant is foraging in an empty cupboard. Rule 11 does not require a district court either to spout a fixed catechism or to use a set of magic words. <u>See</u> <u>id.</u> at 15. Nor does the rule demand explanations of the "technical intricacies of the charges in the indictment." <u>Id.</u> (internal quotation mark omitted). While a district court must touch all of the appropriate bases, it need not be precise to the point of pedantry. In the final analysis, the adequacy of a given colloquy must be assessed in light of "the attributes of the particular defendant, the nature of the specific offense, and the complexity of the attendant circumstances." <u>Id.</u> When the charges are uncomplicated and the defendant is intelligent, reading the indictment to him, placing the charges in

-8-

an appropriate factual context, and obtaining his acknowledgment of understanding will normally suffice.  See id.; United States v. Delgado-Hernández, 420 F.3d 16, 26 (1st Cir. 2005); United States v. Ramirez-Benitez, 292 F.3d 22, 27 (1st Cir. 2002).

In this instance, the charges are not intricate and the circumstances that undergird the charges are about as straightforward as one could imagine.  This is a run-of-the-mine two-person conspiracy.  Several of the overt acts within the charged conspiracy parallel the specific offense counts in the indictment.  Understanding those counts (and, thus, the conspiracy) is child's play: they are rooted in nothing more complicated than hand-to-hand controlled buys.

The defendant's background contains nothing to suggest that he could not easily understand and appreciate these simple charges (which were read to him by the district court).  He is a high-school graduate who has some college-level education. Moreover, his prior conviction for conspiring to distribute crack cocaine evinces a degree of familiarity with the criminal justice system in general and with criminal drug-trafficking conspiracies in particular.  Last but not least, the Agreement attested to the fact that the defendant had discussed the charges with his lawyer and understood them.

Given this mise-en-scène, we conclude that the district court adequately conveyed the nature of the charges.  See Ramos-

-9-

Mejía, 721 F.3d at 15-16.  A more elaborate explanation of various
terms contained in the indictment was not necessary.  See United
States v. Carter, 815 F.2d 827, 829 (1st Cir. 1987) (concluding
that similar charges were "simple enough that a man with a high
school education who says that he understands them should be
believed").

      The defendant's attempt to strengthen his hand by
denigrating the government's recitation of the facts at the change-
of-plea hearing is unavailing.  The prosecutor explained that CW
was observed meeting with the defendant and/or Murphy on divers
occasions, after each of which crack was found in CW's possession.
While the prosecutor did not specify the dates of the transactions,
he described how CW made three controlled buys over the course of
a few weeks beginning December 15, 2011.  Coupled with the reading
of the charges contained in the indictment (which alleged a
conspiracy that was underway by November of 2011 and specified the
dates of the three controlled buys), the prosecutor's version of
the relevant events sufficiently apprised the defendant that the
charges against him encompassed conduct predating the controlled
buys.

      The defendant's contention that the change-of-plea
colloquy did not furnish him with enough information to understand
that certain sentencing enhancements might apply is wide of the
mark.  At the change-of-plea hearing, the government set out the

minimum and maximum penalties appurtenant to the offenses of conviction and elucidated its position with respect to sentencing. The court then explained the process through which it would determine the defendant's sentence. This was more than enough: nothing in Rule 11 obliges a district court to inform the defendant, at a change-of-plea hearing, of the exact manner in which future guideline calculations may evolve. See Fed. R. Crim. P. 11 advisory committee's note (1989 amendment) ("Since it will be impracticable, if not impossible, to know which guidelines will be relevant prior to the formulation of a presentence report and resolution of disputed facts, [the district court is not required] to specify which guidelines will be important or which grounds for departure might prove to be significant."). Any other rule would put the cart before the horse, requiring the court to get the functional equivalent of a full presentence investigation report before it could accept a guilty plea.

The short of it is that where, as here, criminal charges are uncomplicated, reading the indictment, supplying a factual basis for the charges, explaining the manner in which the sentencing guidelines operate, and obtaining the defendant's acknowledgment of understanding will typically suffice to satisfy the strictures of Rule 11. It follows that there was no error, plain or otherwise, in the change-of-plea colloquy.

## B.  __The Stash House Enhancement__.

We come now to the first of the defendant's claims of sentencing error: his claim that the district court erred in enhancing his offense level on the ground that he maintained the apartment as a stash house.  We approach this aspect of the case mindful that the government bears the burden of proving the elements of a sentencing enhancement by a preponderance of the evidence.  See United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011).  We review the district court's factual findings for clear error and its interpretation and application of the sentencing guidelines de novo.  See id.  When the raw facts are susceptible to more than one reasonable inference, a sentencing court's choice between those competing inferences cannot be clearly erroneous. See United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990).

In drug-trafficking cases, the sentencing guidelines direct a district court to increase a defendant's offense level by two levels if he "maintained a premises for the purpose of manufacturing or distributing a controlled substance."  USSG §2D1.1(b)(12).  Here, the proof — drawn largely from the suppression hearing — was something of a mixed bag.

On the one hand, the evidence showed that the defendant did not own or rent the apartment (the ostensible tenant being one Crystal Croteau), did not receive mail there, did not use the address on any official forms (say, a driver's license), and did

-12-

not contract for any of the utilities (which were billed to Croteau). The surveillance evidence indicated that the defendant's primary residence was his girlfriend's home, not the apartment.

On the other hand, the evidence showed that the defendant had ready access to the apartment. He testified that he had gotten a key from Croteau and admitted that he sometimes delivered the rent money on her behalf. He further admitted that he had given a duplicate key to Murphy, that he from time to time spent the night at the apartment (sometimes alone and sometimes with his girlfriend), that he kept clothes and a toothbrush there, and that he felt free to come and go as he pleased. There was no evidence that Croteau had ever lived in the apartment or that Murphy had ever spent the night there.

Based on the facts developed during the government's surveillance and the suppression hearing, the district court found that the defendant had dominion and control over the apartment and used it principally for purposes of his drug-distribution enterprise. The court proceeded to apply the stash house enhancement, hiking the defendant's offense level by two levels. The defendant objected below, and renews his objection on appeal.

The stash house enhancement was developed as a response to the Fair Sentencing Act of 2010, which directed the Sentencing Commission to provide for a two-level enhancement when "the defendant maintained an establishment for the manufacture or

-13-

distribution of a controlled substance, as generally described in
[21 U.S.C. § 856]."  Pub. L. No. 111-220, § 6(2), 124 Stat. 2372,
2373.  In view of the enhancement's lineage, courts interpreting it
have generally looked to case law interpreting 21 U.S.C. § 856.
See, e.g., United States v. Flores-Olague, 717 F.3d 526, 531-32
(7th Cir. 2013); United States v. Miller, 698 F.3d 699, 705-07 (8th
Cir. 2012).  We follow this praxis.

     The stash house enhancement applies when a defendant
knowingly maintains a premises for the purpose of manufacturing or
distributing a controlled substance.  See USSG §2D1.1, comment.
(n.17); see also United States v. Verners, 53 F.3d 291, 295-96
(10th Cir. 1995).  The term "maintains" is not defined either in
the guideline or in its statutory antecedent.  The Sentencing
Commission's commentary, designed to bridge this gap, instructs
courts to consider, among other things, "whether the defendant held
a possessory interest in (e.g., owned or rented) the premises" and
"the extent to which the defendant controlled access to, or
activities at, the premises."  USSG §2D1.1, comment. (n.17).  In
cases arising under section 856, courts have deemed relevant
considerations such as "[a]cts evidencing such matters as control,
duration, acquisition of the site, renting or furnishing the site,
repairing the site, supervising, protecting, supplying food to
those at the site, and continuity."  United States v. Clavis, 956
F.2d 1079, 1091 (11th Cir. 1992).  This is obviously a non-

-14-

exhaustive list; as particular cases vary, so too will the factors that may inform the question of whether a defendant maintains a premises.

The "use" component of the stash house enhancement is likewise protean. Nevertheless, one thing is clear: for the enhancement to apply, drug distribution need not be the sole reason that a defendant maintains the premises. Rather, drug distribution must be a "primary or principal" use, as opposed to a use that is merely "incidental or collateral." USSG §2D1.1, comment. (n.17). A defendant's purpose may be inferred from the totality of the circumstances, including such facts as the quantity of drugs discovered and the presence of drug paraphernalia or tools of the drug-trafficking trade. See Flores-Olague, 717 F.3d at 533-34; see also Verners, 53 F.3d at 296-97 (explaining that "the more characteristics of a business that are present, the more likely it is that the property is being used" for a prohibited purpose). One relevant consideration is frequency; that is, how often the defendant used the premises for drug-related purposes and how often he used the premises for lawful purposes. See USSG §2D1.1, comment. (n.17).

Examined through this prism, the district court's deployment of the stash house enhancement passes muster. There was ample evidence that the defendant exercised dominion and control over the apartment. He had a key, came and went at will, and slept

-15-

there whenever he pleased.  He — and no one else — kept clothes and
toiletries there.  In addition, he controlled the activities that
took place at the apartment (by, for example, furnishing a key to
his coconspirator) and ensured that the premises would remain
available by delivering rent payments.

The district court's finding that a sufficient nexus
existed between the premises and the defendant's drug-trafficking
activities is unimpugnable.  Surveillance evidence showed that the
defendant and Murphy sold drugs from the apartment for nearly three
months.  Furthermore, the DEA's search of the apartment disclosed
that sizeable quantities of cocaine and numerous accouterments of
the drug-trafficking trade (e.g., a digital scale, boxes of baking
soda and sandwich bags, kilo wrappers bearing cocaine residue, and
a pot and spoon that tested positive for cocaine) were being kept
there. Viewed against this backdrop, we discern no clear error in
the district court's finding that a principal use of the apartment
was for activities related to the defendant's distribution of
controlled substances.

The defendant's efforts to resist the enhancement are
unavailing.  To begin, he argues that he did not maintain the
apartment at all since he neither owned nor rented it.  This is
true as far as it goes, but it does not take the defendant very
far.  The enhancement does not require either ownership or a
leasehold interest.  See, e.g., United States v. Renteria-Saldana,

-16-

755 F.3d 856, 859-60 (8th Cir. 2014); <u>Flores-Olague</u>, 717 F.3d at 532.  This makes good sense: it would defy reason for a drug dealer to be able to evade application of the enhancement by the simple expedient of maintaining his stash house under someone else's name. <u>See</u> <u>United States</u> v. <u>Morgan</u>, 117 F.3d 849, 857-58 (5th Cir. 1997).

The defendant's second plaint is no more compelling.  He asserts that he lacked sufficient control over the apartment because his access was non-exclusive.  This is wishful thinking: the terms of the enhancement do not require that a defendant control access to the premises to the exclusion of all others.

The defendant's third attack on the imposition of the enhancement is an exercise in revisionist history.  He challenges the finding that a primary use of the apartment was for drug distribution on the ground that he and others used the apartment as a residence.  That is pure codswallop: the court below supportably found that the apartment was not the defendant's habitual residence, and the record contains no evidence that anyone else lived there.

Finally, the defendant complains that what was sauce for the goose was not sauce for the gander: when sentenced, Murphy did not receive the stash house enhancement.  Building on this rickety foundation, he suggests that applying the enhancement to him results in an unwarranted sentencing disparity.  This suggestion is vecordious.

-17-

To begin, the defendant's argument erects a false dichotomy. The issue is whether the record fairly supports the enhancement as to the defendant. Whether Murphy (who was sentenced at a different time and on what may have been a different record) deserved a similar enhancement is a different question. See, e.g., United States v. Rios, 893 F.2d 479, 481 (2d Cir. 1990) (per curiam).

At any rate, the district court warrantably found the evidence that the defendant maintained the apartment "much stronger" than the evidence that Murphy maintained it. Thus, any disparate treatment was fully justified.

## C. **The Added Criminal History Points**.

In selecting a defendant's criminal history category (CHC), the guidelines direct the sentencing court to add two criminal history points if the defendant committed the offense(s) of conviction while under a criminal justice sentence. See USSG §4A1.1(d). It is undisputed that a supervised release term is a criminal justice sentence, see id., and that the defendant was on supervised release in connection with a prior drug-trafficking conviction until December 13, 2011. For this reason, the court below added the two criminal history points — an action that boosted the defendant into a higher CHC.

The defendant protests. He insists that the conduct underlying the offenses of conviction did not begin until December

-18-

Case 1:12-cr-10084-RBS Document 182 Filed 02/20/15 Page 19 of 28

15, 2011 (the date of the first controlled buy) and that,
therefore, the district court had no right to add the two extra
criminal history points.

This dog will not hunt.   The conspiracy charge is the
linchpin of the government's case, and the indictment stated that
the lifespan of the conspiracy ran at least from November of 2011
to January of 2012.   The defendant pleaded guilty to that charge.
By doing so, the defendant admitted that he was guilty of
participating in the charged conspiracy as early as November of
2011 (a time when he was still serving his supervised release
term).   See United States v. Hernández, 541 F.3d 422, 424-25 & n.1
(1st Cir. 2008); see also United States v. Grant, 114 F.3d 323, 329
(1st Cir. 1997) ("When a criminal defendant pleads guilty, he
admits not only that he committed the factual predicate underlying
his conviction, but also that he committed the crime charged
against him." (internal quotation marks omitted)).   No more is
exigible to justify the two added criminal history points.[4]

_____

[4] If more were needed — and we do not think that it is — the
presentence investigation report cited evidence that the defendant
and Murphy were actively selling crack cocaine out of the apartment
in November and early December.   Although the defendant
unsuccessfully objected to those portions of the report, he offered
no evidence in refutation.   Where, as here, a defendant's
objections to a presentence investigation report are wholly
conclusory and unsupported by countervailing evidence, the
sentencing court is entitled to rely on the facts set forth in the
presentence investigation report.   See United States v. Cyr, 337
F.3d 96, 100 (1st Cir. 2003).

### D. **The Pro Se Brief**.

This brings us to the defendant's pro se brief, which advances what amount to three additional assignments of error.[5] We first set the stage and then address the defendant's claims.

1. **Setting the Stage**. After Attorney Cloherty moved to withdraw, the district court conducted two hearings. At the first hearing, Attorney Cloherty indicated that he and the defendant disagreed about what arguments to present in the suppression motion. He did not offer any specifics, but said that he and the defendant had been trying to reconcile their differences. For his part, the defendant provided little further illumination.

Premised in part on its own observations, the district court concluded that the defendant and Attorney Cloherty were communicating and, at most, had described "a vague dispute" over legal strategy. The court told the defendant that it would not appoint yet a fourth attorney for him. Consequently, he had the choice of continuing to be represented by Attorney Cloherty or proceeding pro se. After conferring with Attorney Cloherty, the defendant stated a preference for representing himself with Attorney Cloherty as standby counsel. But when the court attempted to conduct a waiver colloquy, see Faretta v. California, 422 U.S.

---

[5] The pro se brief hints at other claims — but these are either insufficiently developed or plainly unsupportable.

806, 835 (1975), the defendant refused to participate.  On that discordant note, the court adjourned the hearing.

      Attorney Cloherty thereafter filed a status report, stating that he had spoken to the defendant and that the defendant wished to proceed pro se (with Cloherty as standby counsel).  The court then convened a second hearing, at which the defendant once again urged the court to appoint new counsel.  He explained that he and Attorney Cloherty disagreed about whether and how to raise the issue of standing in connection with the apartment search.  Attorney Cloherty suggested that the standing issue was not the best example of their disagreements; the defendant, he said, wanted him to raise other (unidentified) issues, none of which he (Attorney Cloherty) thought viable.  The court revisited the matter, and again concluded that the attorney-client relationship had not experienced an irretrievable breakdown.  Thus, the court refused to appoint new counsel.

      The court then embarked on a <u>Faretta</u> colloquy.  As a precursor, it warned the defendant that he would not represent himself as effectively as would Attorney Cloherty.  The defendant acknowledged as much but nonetheless persisted in his decision to proceed pro se with standby counsel.[6]

_____

      [6] At the first hearing, the concept of "standby counsel" had been fully explained to the defendant.

Beginning the <u>Faretta</u> colloquy, the court carefully informed the defendant that he had a constitutional right to counsel and that his waiver of that right must be knowing and voluntary.  The court reminded the defendant that he was not a lawyer and that Attorney Cloherty would almost certainly do a better job for him.  It then warned that "by presenting certain issues . . . [the defendant] may actually be presenting certain information to the Court or to the government that may be a hazard" to him.  Notwithstanding these admonitions, the defendant repeated that he wanted to represent himself — and he signed a written waiver of his right to counsel.

> **2.  <u>Denial of Motion to Withdraw</u>.**  The defendant's first pro se claim of error relates to the district court's denial of Attorney Cloherty's motion to withdraw.[7]  The governing legal principles are familiar.  A criminal defendant's Sixth Amendment right to counsel is a right of the highest order.  <u>See</u> <u>Johnson</u> v. <u>Zerbst</u>, 304 U.S. 458, 467-68 (1938).  Thus, an indigent defendant in a criminal case is entitled to appointed counsel — but that does not mean that such a defendant has an unbounded right to the particular counsel of his choosing.  <u>See</u> <u>United States</u> v. <u>Myers</u>,

---

[7] The defendant complains not only that the court should have granted the motion to withdraw but also that the court should have agreed to appoint new counsel.  Since these are two sides of the same coin, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Díaz-Rodríguez</u>, 745 F.3d 586, 590 n.4 (1st Cir. 2014), we analyze the claim of error solely in terms of the motion to withdraw.

-22-

294 F.3d 203, 206 (1st Cir. 2002).    In some circumstances, a
district court may force a defendant to choose between proceeding
with unwanted counsel or no counsel at all.    See, e.g., United
States v. Proctor, 166 F.3d 396, 402 (1st Cir. 1999).

We review the denial of a motion to withdraw for abuse of
discretion.[8]    See United States v. Reyes, 352 F.3d 511, 515 (1st
Cir. 2003).    In conducting this tamisage, we assay "the timeliness
of the motion, the adequacy of the court's inquiry into the
defendant's complaint, and whether the conflict between the
defendant and his counsel was so great that it resulted in a total
lack of communication preventing an adequate defense."    Id.
(internal quotation marks omitted).    Here, the first two factors
are not in dispute: the government concedes the timeliness of the
motion, and both sides agree that the court's inquiry was adequate.
Accordingly, we train the lens of our inquiry on the third factor.

Reviewing the record that was before the district court
when it made the challenged ruling, see United States v. Pierce, 60
F.3d 886, 891 (1st Cir. 1995), we conclude that the court did not
abuse its discretion in denying the motion to withdraw.    Neither

---

[8]    It is an open question in this circuit whether an
unconditional guilty plea bars a defendant from later contesting
the denial of a motion to withdraw.    See United States v. Hicks,
531 F.3d 49, 54 n.8 (1st Cir. 2008); United States v. Gaffney, 469
F.3d 211, 214-15 (1st Cir. 2006).    Here, however, the government
has not argued that the defendant is barred from contesting the
denial of the motion.    Consequently, the government has waived the
point.    See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.
1990).

the defendant nor Attorney Cloherty identified the full extent of
their disagreement. Although the defendant noted a dispute about
standing, Attorney Cloherty indicated that issue was not the
primary source of their discord, and the defendant provided no
further details. In addition, the record makes manifest that
Attorney Cloherty and the defendant were communicating at an
acceptable level before, during, and after the hearings on the
motion to withdraw. We hold, therefore, that the district court
acted within its discretion in denying the motion to withdraw. See
United States v. Francois, 715 F.3d 21, 29 (1st Cir. 2013) (holding
that disdain for counsel's advice was not irreparable breakdown
where client and counsel were communicating); United States v.
Woodard, 291 F.3d 95, 108 (1st Cir. 2002) (holding that attorney's
refusal to file a motion he deemed frivolous, without more, did not
constitute irreparable breakdown).

3. **Waiver Colloquy.** The defendant next claims that his
waiver of the right to counsel was invalid because the district
court failed to give him appropriate advice about his rights. This
claim lacks force.

To be sure, a criminal defendant may waive his right to
legal representation. See Faretta, 422 U.S. at 834. But because
significant disadvantages accompany self-representation, the trial
court must ensure that such a waiver is knowing, intelligent, and
voluntary. See Woodard, 291 F.3d at 109. To this end, the court

-24-

must make certain that the defendant states his intent to relinquish his right to counsel in "unequivocal language." Id. Relatedly, the court must advise the defendant "of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." Faretta, 422 U.S. at 835 (internal quotation marks omitted).

Seeking to find sanctuary in these protections, the defendant argues that he never expressed his desire to represent himself in unequivocal terms. This argument is belied by the record. The defendant's decision to proceed pro se was stated in no uncertain terms in the written status report that Attorney Cloherty filed with the district court on his behalf. The defendant reaffirmed that decision both in his response to the court's questioning at the second hearing and in the waiver form that he executed.

The defendant's fallback position is that his waiver of the right to counsel was not knowing and intelligent because the court's Faretta warning was inadequate. This claim comprises more cry than wool.

At a Faretta hearing, the district court is not required to make a rote recitation of a detailed script. See United States v. Robinson, 753 F.3d 31, 43 (1st Cir. 2014). While a court must do more than make vague allusions to the consequences of a waiver,

-25-

the efficacy of the court's <u>Faretta</u> warning must be evaluated on
the basis of the record as a whole.  We will uphold a waiver of the
right to counsel as long as the record supports a reasoned
conclusion that the defendant was fully apprised of his right to
counsel and of the disadvantages he would encounter should he elect
to proceed pro se.  <u>See</u> <u>id.</u> at 44-45; <u>Francois</u>, 715 F.3d at 30-31.

    The <u>Faretta</u> warning here easily passes through this
screen.  The district court warned the defendant of the general
dangers of self-representation.  Indeed, the court went so far as
to tell the defendant that it was "a terrible idea" for him to
represent himself.  The court also warned him that, without a
lawyer, he might inadvertently reveal information that would come
back to bite him.

    Even though the colloquy was relatively brief, the record
as a whole adequately supports the court's determination that the
defendant's waiver of the right to counsel was made with his eyes
wide open.  <u>See</u>, <u>e.g.</u>, <u>Robinson</u>, 753 F.3d at 44-46; <u>United States</u>
v. <u>LaBare</u>, 191 F.3d 60, 67-68 (1st Cir. 1999).  The defendant's
choice may well have been foolhardy, but it was not uninformed.

    **4.  <u>Ineffective Assistance of Counsel</u>.**  The defendant's
remaining claim is rooted in the notion that Attorney Cloherty was
ineffective in the run-up to the suppression motion and that,
therefore, the defendant had no practical choice but to go it
alone.  This claim is not properly before us.

-26-

It is well-settled that factbound claims of ineffective assistance of counsel, not raised in the district court, cannot be broached for the first time on direct review. See United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993). Rather, such claims typically must be brought before the district court in a collateral post-conviction proceeding. See id. Although we may make an occasional exception in those rare instances in which the record is sufficiently developed to permit reasoned consideration of a previously unexplored ineffective assistance claim at the appellate level, see, e.g., United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991), this case falls well within the compass of the general rule. The record below is utterly devoid of relevant information concerning what transpired between Attorney Cloherty and the defendant. The same holds true for the defendant's belated suggestion that he was forced to plead guilty because of Attorney Cloherty's deficient trial preparation. Consequently, we dismiss this claim of error without prejudice to the defendant's right to seek relief pursuant to 28 U.S.C. § 2255.

### E.  A Loose End.

While this case was pending on appeal, the Sentencing Commission adopted an amendment that reduced the recommended penalties for many drug offenses by decreasing the applicable base offense levels. See USSG App. C, Amend. 782 (Nov. 1, 2014). These reductions were later given retroactive effect. See USSG App. C,

Amend. 788 (Nov. 1, 2014).  The defendant invites us to remand his case for resentencing under this amended guideline.

We decline this invitation.  The remedy for a defendant who seeks resentencing under a retroactive guideline amendment is to file a motion in the district court.  See 18 U.S.C. § 3582(c)(2); see also United States v. Rivera Calderón, 578 F.3d 78, 107-08 (1st Cir. 2009); United States v. Chandler, 534 F.3d 45, 51 (1st Cir. 2008).  We therefore reject the defendant's request; without prejudice, however, to the defendant's right to file a motion in the district court seeking this relief.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we affirm both the defendant's conviction and his sentence.  Our decision is without prejudice to the defendant's right to raise his ineffective assistance of counsel claim, if he so chooses, in a collateral proceeding under 28 U.S.C. § 2255.  Our decision is similarly without prejudice to the defendant's right to seek resentencing in the district court under the guideline amendments discussed above.


**So Ordered.**